**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

---

UNITED STATES,

Plaintiff,

v. Case No. 1:25-cr-4149-KWR

TOMAS SANCHEZ,

Defendant.

**MEMORANDUM OPINION AND ORDER DENYING MOTION TO SUPPRESS**

THIS MATTER comes before the Court upon Defendant Sanchez's Opposed Motion to Suppress Evidence **(Doc. 43)**, filed on May 14, 2026. Having reviewed the parties' briefs and applicable law, the Court finds that Defendant Sanchez's Motion is not well taken and, therefore, is **DENIED**.

**BACKGROUND**

On August 21, 2025, Officer Rodriguez ("the Officer") pulled over a vehicle after observing it following another vehicle too closely. **Dashcam at 00:26, Resp. to Mot. to Suppress (Ex. 1), Doc. 45.** Inside the vehicle was the driver (Garcia), the owner (Amanda Quintana), the Defendant Tomas Sanchez ("Sanchez"), and another female passenger ("Espie"). **Resp. to Mot. to Suppress at 2, Doc. 45; Supp. Police Report at 2, Doc. 45 (Ex. 2)**. After an initial interaction in the vehicle where the occupants provided their documentation, the Officer and Garcia went to the patrol car. **Dashcam at 2:23**.

During their conversation in the patrol car, Garcia laughed awkwardly at non-humorous statements and commented on the police dog. **Dashcam 3:24; Supp. Police Report at 1**. The

Officer asked Garcia about his travel plans and Garcia said the group had been in Flagstaff for the weekend, but the stop occurred on a Thursday. **Dashcam 3:50; Dashcam 4:52; Supp. Police Report at 1**. Garcia said he traveled to Flagstaff to visit family and the outdoors. **Dashcam 5:06.** Garcia was unable to say the names of the two women in the vehicle, claiming they were Tomas Sanchez's friends. **Dashcam at 5:21**.

Exiting the patrol car, the Officer reapproached the pulled over vehicle to check the VIN. ***Id*. at 6:48–8:54**. He asked the remaining occupants where they had been, and they contradicted Garcia by answering Phoenix not Flagstaff. ***Id*. at 4:50, 8:19**. The Officer returned to the patrol car, gave Garcia a warning and communicated to him that the stop was over, but the parties dispute the exact language.[1] ***Id*. at 10:51**. Then the Officer asked Garcia if he could ask him more questions. ***Id*. at 11:01**. In response, Garcia said he was in a hurry, but then the two had a brief exchange in which Garcia denied the presence of drugs in the vehicle. ***Id.* at 11:01–11:30.** The Officer then went back to the pulled over vehicle and spoke with Quintana. ***Id*. at 11:55–13:16**. Quintana said that "these guys" (seemingly referring to Garcia and Sanchez) brought her a U-Haul in Phoenix, doubling down a different story than Garcia had told. **Dashcam at 13:02.**

The Officer ran his K-9 "Tank" around the vehicle and the dog alerted to several parts of the vehicle. ***Id*. at 16:07**. The Officer then searched the vehicle and found 40 grams of a mixture containing fentanyl. **Resp. to Mot. to Suppress at 6**. The stop took around twenty-five minutes

[1] In relation to when the initial stop was ended by the Officer, Sanchez insists that "Officer Rodriguez speaks quickly and softly, it is difficult to hear if he tells . . . [Garcia] that he is free to go, or that he is good to go." **Doc. 71 at 7.** The two versions Sanchez suggests do not seem to be meaningfully different. "Good to go" appears to suggest the stop is over just as much as "free to go." At the suppression hearing, the Officer testified that he said, "Here you go, free to go." **Transcript at 56.** The Court finds that the stop was over when the Officer communicated to Garcia that he was free or good to go. The Court finds that the Officer communicated the stop was over, regardless of the specific terminology that the parties debate.

from the start of the traffic stop until Sanchez was placed in handcuffs. ***Id***; **Mot. to Suppress at 5.**

**DISCUSSION**

**I. <u>The traffic stop was justified at its inception.</u>**

The traffic stop was justified at its inception as the Officer had reasonable suspicion of a traffic violation. The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes a 'seizure' of 'persons' within the meaning of the Fourth Amendment." *United States v. Dawson*, 90 F.4th 1286, 1290 (10th Cir. 2024) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). A traffic stop is reasonable if it is (1) "justified at its inception" and (2) remains "reasonably related in scope to 'the mission of the stop itself.'" *United States v. Cates*, 73 F.4th 795, 805 (10th Cir. 2023) (citing *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017) (quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015))).

"A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009); *see also United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."). "Once [an officer] observe[s] [a driver] commit a traffic violation, he [has] reasonable suspicion to stop [the driver's] car." *United States v. Parker*, 72 F.3d 1444, 1449 (10th Cir. 1995) (citation omitted). "It is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary

or routine according to the general practice of the police department or the particular officer making the stop.'" *Botero-Ospina*, 71 F.3d at 787 (citation omitted). "It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.* The "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

Sanchez observes that the Government has the burden to prove that the initial traffic stop was performed with reasonable suspicion. **Mot. to Suppress at 4.** The Government argues that the traffic stop was a valid stop for a violation of the state law prohibiting cars from following other vehicles too closely. **Resp. to Mot. to Suppress at 7.** Additionally, the Government contends the Officer validly used his discretion to make the stop. ***Id.***

Here, the Officer stopped the Equinox after observing a violation of N.M. Stat. Ann. § 66-7-318(A). This provision states: "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and condition of the highway." N.M. Stat. Ann. § 66-7-318(A) (2024). As the statute does not define an exact distance that is prudent to follow, the Court should not second-guess the Officer's determination. Additionally, the Court has reviewed the dashcam footage and agrees with the Officer that the vehicle appears to be following closer than a safe distance. **Dashcam at 0:00.** Even if not, the mistake would have been a reasonable one. Therefore, the stop was properly initiated under suspicion of a traffic violation.

## II. The Officer's questioning during the traffic stop was proper under the Fourth Amendment.

The Officer acted properly during the stop by asking questions about travel plans and questions pertaining to identity among other topics. During a routine traffic stop, an officer can

"legitimately ask questions relating to the identity and travel plans of [the driver] and [passenger] and the ownership of the car [the driver] was driving, regardless of [the officer's] underlying motivation." *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989). "Even in the absence of reasonable suspicion an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop." *United States v. Simpson*, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010) (citing *Wilson v. Sirmons*, 536 F.3d 1064, 1110 (10th Cir. 2008)).

As the Officer's questioning occurred during a valid traffic stop, the Officer properly asked questions about travel plans, the identity of passengers, and the owner of the vehicle. *Rivera*, 867 at 1263. Therefore, the Officer's questioning during the traffic stop did not violate the Fourth Amendment.[2] [3]

## III. <u>The Officer's questioning and VIN inspection during the traffic stop pertained to the mission of the traffic stop and, therefore, were proper under the Fourth Amendment</u>

Prior to developing reasonable suspicion for an offense besides the violation of traffic law, the Officer acted properly during the stop by asking questions about travel plans and other routine topics. Sanchez argues that the Officer improperly investigated criminal violations during a routine traffic stop by asking about travel plans and probing for evidence of other offenses. **Mot. to**

---

[2] Sanchez makes much of the Officer accepting a "paycheck stub and not registration and insurance" documents from the occupants. **Doc. 71 at 2.** Sanchez contends that the acceptance of the documents indicated an improper intent to investigate other crimes. Sanchez reasons that the Officer would not have accepted these documents if he actually cared about the traffic violation. At the suppression hearing, the Officer testified this is a common practice he does for efficiency and safety purposes when vehicle occupants are unable to easily access documents. **Transcript at 14.** The Court finds this testimony credible. The Officer acted properly in accepting the documents the occupants provided to him for identification purposes.

[3] Sanchez also contends that the Officer performs duties for the Department of Homeland Security in drug trafficking makes "his intention" somehow problematic. **Doc. 71 at 2.** Putting aside other issues with this argument, the subjective intent of the Officer is irrelevant. *Botero-Ospina*, 71 F.3d at 787.

**Suppress at 5.** The Government argues that asking routine questions related to travel or safety during a traffic stop is permissible under the Fourth Amendment. **Resp. to Mot. to Suppress at 10.**

During a routine traffic stop, an officer can "legitimately ask questions relating to the identity and travel plans of [the driver] and [passenger] and the ownership of the car [the driver] was driving, regardless of [the officer's] underlying motivation." *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989). "Even in the absence of reasonable suspicion an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop." *United States v. Simpson*, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010) (citing *Wilson v. Sirmons*, 536 F.3d 1064, 1110 (10th Cir. 2008)). "A traffic stop becomes unlawful . . . when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion." *Cates*, 73 F.4th at 805 (citing *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (quotation omitted); *see also Rodriguez*, 575 U.S. at 354–55.

An officer's "mission" during a routine traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns." *See Mayville*, 955 F.3d at 830 (citing *Rodriguez*, 575 U.S. at 354). This includes "steps necessary to issue a ticket or warning, and ordinary inquiries incident to the traffic stop, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Cates*, 73 F.4th at 805 (quotation modified). "Officers may not divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes." *Id*. (quotations omitted); *see also Dawson*, 90 F.4th at 1291. However,

"[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333; *see also Rodriguez*, 575 U.S. at 354 ("Authority for the seizure [ends] when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

Here, the Officer acted properly as questions pertaining to travel plans and identification were within the scope of the traffic stop. **Dashcam 4:50; 5:06; 8:19.** Additionally, the Officer performed a VIN inspection which also pertains to the safety-related mission of a traffic stop. VIN inspections are an ordinary component of a traffic stop and are generally reasonable. *New York v. Class*, 475 U.S. 106, 115 (1986). Therefore, the Officer did not violate the Fourth Amendment as the Officer asked permissible questions pertaining to identity and safety purposes and these questions did not extend the stop. *Rivera*, 867 F.2d at 1263.

## IV. <u>The duration of the traffic stop was proper under the Fourth Amendment.</u>

The Officer's twenty-five-minute stop was reasonable. Sanchez argues that an approximately 25-minute stop was excessively long for a routine traffic stop. **Mot. to Suppress at 5–6.** The Government responds that the length of the stop was well within permissible limits. **Resp. to Mot. to Suppress at 10.**

"The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). But this is not without limit: a traffic stop must "last no longer than is necessary to effectuate the purposes of the stop." *United States v. Sandoval*, 29 F.3d 537, 539 (10th Cir. 1994). The analysis focuses on the "reasonableness of [a] traffic stop in light of both the length of the detention and the manner in which it was carried out." *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007); *see*

*generally Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.") (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)). "Even de minimis delays by unrelated inquiries violate the Fourth Amendment." *Cates*, 73 F.4th at 805 (citing *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020)). The Officer took around twenty-five minutes to conduct the stop, from the time when the Officer pulled the car over to the arrest. This time included checking the license and registration, writing a citation, questioning Mr. Garcia about his travel plans, and running a computer check. If anything, the Officer was quite expedient. Similar times and times longer than twenty-five mins are reasonable for Fourth Amendment purposes. *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996) (holding that a thirty-minute delay for a computer check was reasonable). Here, the stop was a reasonable length. *Shareef*, 100 F.3d at 1502.

## V. The stop was lawfully extended by reasonable suspicion.

After the Officer returned Garcia's documentation to him and told him he was free to leave, the initial stop was over. **Dashcam 10:53.** The Officer needed reasonable suspicion to extend the stop after returning Garcia's documentation. *See Arizona*, 555 U.S. at 333. The subsequent questioning of Garcia and Quintana is only valid if the Officer possessed reasonable suspicion. ***Id.***; ***Id.* at 12:35.**

The Government argues that the stop extension was justified by reasonable suspicion under the following bases. **Resp. to Mot. to Suppress at 11.** First, the Government contends the occupants were showing signs of nervousness. ***Id.*** Second, the occupants had difficulty answering simple travel plan questions: the occupants did not know each other's names despite being on a multi-hour car ride, Garcia said he was asked to ride along with Tomas but also said he had been

visiting family, and Quintana said they were in Phoenix, but Garcia said Flagstaff. **Dashcam 3:50, 4:52, 5:06, 5:21.** Third, the stop occurred on a drug corridor. **Resp. to Mot. to Suppress at 11.**

Sanchez responds that the stop extension was not justified. **Reply to Response to Mot. to Suppress at 3, Doc. 47.** First, Sanchez argues that only extreme nervousness, not normal nervousness, contributes meaningfully to reasonable suspicion. ***Id.*** Second, implausible travel plans do not contribute to reasonable suspicion and transport-insecurity affecting impoverished people leads to plans that look implausible to others. ***Id.* at 4–5.** Third, major interstates are essentially all drug corridors, and this factor does not exclude any meaningful portion of innocent travelers. Thus, the location of the stop along a "drug corridor" does not contribute to reasonable suspicion. ***Id.* at 3.**

As mentioned, once a traffic stop is completed, the driver must be allowed to leave unless "the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." *United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005). Reasonable suspicion exists if an officer has "a particularized and objective basis for suspecting the . . . [defendant] of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quotations omitted). "The existence of objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances." *Simpson*, 609 F.3d at 1146 (citation and internal quotations omitted). Though the "government bears the burden of demonstrating the reasonableness of the suspicion," it "is not an onerous standard." *United States v. Cortez*, 965 F.3d 827, 834 (10th Cir. 2020); *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) ("[The] level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause." (citation and internal quotations omitted)). "To satisfy the reasonable suspicion standard, an officer need not rule out

the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity." *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013) (Gorsuch, J.) (citations and internal quotations omitted). Indeed, factors can raise objectively reasonable suspicion even if "consistent with innocent travel." *Simpson*, 609 F.3d at 1147 (citation modified). Courts give "deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances . . . ." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997).

The Officer had specific, articulable factors that provided reasonable suspicion. Implausible travel plans can give rise to reasonable suspicion. *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007). Implausible travel plans, such as significant travel for a short visit can be enough for reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989). The Tenth Circuit has also "noted numerous times that implausible travel plans can form a basis for reasonable suspicion." *United States v. Torres*, 786 Fed. Appx. 726, 737 (10th Cir. 2019) (quoting *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007). At times, the Tenth Circuit has been reluctant to consider unusual travel plans to be sufficiently implausible as to form a basis for reasonable suspicion. *United States v. Simpson*, 609 F.3d 1140, 1149 (10th Cir. 2010); *Courtney v. Oklahoma ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1225 (10th Cir. 2013) (finding no implausible travel plans sufficient for reasonable suspicion when defendant was traveling from one state to another to visit family without "any lies, evasions, or inconsistencies"). The Tenth Circuit distinguishes between bizarre travel plans, inconsistencies in stories, or lack of knowledge about travel and, on the other hand, simply unusual travel plans, such as driving a long distance or using an odd mode of transport. *Simpson*, 609 F.3d at 1148–1152. According to the Tenth Circuit,

the first category can be sufficient for reasonable suspicion while merely unusual plans are insufficient. *Id.* The line between these categories is at times blurry. *Id.* at 1148.

Here, Garcia gave conflicting stories with other passengers and did not know the names of the other passengers. **Dashcam at 4:50, 5:21, 8:19.** Unexplained inconsistencies and lack of knowledge about travel plans suggest reasonable suspicion. *Torres*, 786 Fed. Appx. at 737. The occupants denied knowing each other's names. **Dashcam 5:21.** The occupants also gave conflicting stories about the purpose and origin of their trip, with one occupant saying they came from Flagstaff while the other said Phoenix. ***Id.*** **4:50, 8:19.** This disparity seems unlikely to be accidental as the Officer asked probing follow-up questions. After Garcia had initially said he traveled only to Flagstaff, the Officer asked him to clarify he had not gone elsewhere and Garcia denied going anywhere else. **Dashcam 9:53.** Additionally, Garcia said he was traveling to visit family and outdoors, but Quintana said they had picked up a U-Haul. **Dashcam 13:02.** Thus, there was a combination of the occupants' implausible travel plans, inconsistent stories, and the occupant's inability to name one another. The Officer observed that from his experience these and other factors indicated suspicious, criminal activity that was not consistent with normal, innocent travelers. **Suppression Hearing Transcript ("Transcript") at 30, Doc. 67;** *United States v. Leon*, 80 F.4th 1160, 1170 (10th Cir. 2023) (reasonable suspicion "factors together must serve to eliminate a substantial portion of innocent travelers"). Thus, the travel plans were likely sufficiently implausible to create reasonable suspicion. In conclusion, the Officer observed implausible travel plans and contradictory stories from the occupants that are sufficient for reasonable suspicion.[4]

---

[4] Sanchez fixates on seemingly minor elements of the Officer's testimony and argues that they do not establish reasonable suspicion. For example, Sanchez criticizes the Officer for saying "that certain behavior is Odd seven (7) times and Suspicious (8) times." **Doc. 71 at 3.** Sanchez also

Sanchez points out potential shortcomings with some of the Government's other arguments for bases of reasonable suspicion. Extreme, rather than ordinary nervousness is often required to meaningfully contribute to reasonable suspicion. *United States v. Simpson*, 609 F.3d 1140, 1148 (10th Cir. 2010) (citation modified). Here, the Officer primarily points to awkward or inappropriate laughter which is likely not sufficient to be extreme nervousness. Therefore, this normal nervousness or awkwardness does not meaningfully contribute to reasonable suspicion. Additionally, the Government's argument that the stop's location on a "drug corridor" also does not weigh heavily towards reasonable suspicion. The Tenth Circuit has rejected this type of argument as having a meaningful contribution to reasonable suspicion. *United States v. Guerrero*, 472 F.3d 784, 787–88 (10th Cir. 2007) (rejecting connection between traveling from drug source area with reasonable suspicion); *United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1274 n.3 (10th Cir. 2007) (noting that essentially every highway is a drug corridor making it irrelevant to reasonable suspicion). In conclusion, the Officer has reasonable suspicion based on the implausible travel plans and conflicting stories despite the counterarguments Sanchez raises.

The Government argues that even if the stop was not extended by reasonable suspicion, the stop was extended by consent. As the Court has concluded above that the stop was extended through reasonable suspicion, the Court does not need to decide the Government's alternative argument.

---

disagrees with the Officer that the occupants' blank, forward stares and anxious glances behind themselves could contribute to reasonable suspicion. To the Sanchez, "[i]t is . . . contradictory, Officer Rodriguez finds it suspicious whether a person looks around, or whether a person looks straight ahead." ***Id.* at 4.** The Court finds the Officer's statements that he found these behaviors suspicious to be credible. **Transcript at 16.** The Court does not think it is contradictory for the Officer to find both looking forward blankly and nervously turning around suspicious. Both these behaviors seem suspicious. Regardless, the Government does not focus on these actions as a main basis for the Officer's reasonable suspicion.

## VI. The K-9 search was valid under the Fourth Amendment.

As discussed above, reasonable suspicion existed for the extension of the stop. The Court finds that the K-9 search was also done with reasonable suspicion and a reliable K-9 performed the dog sniff. Sanchez argues that the K-9 search was done without reasonable suspicion and that the K-9 search was performed by a dog that did not have the proper qualification, including some creative arguments regarding who signed the certificate and when the certificate was produced. **Mot. to Suppress at 7; Doc. 71 at 11.** The Government argues that (1) the K-9 search was done with reasonable suspicion and (2) the dog was properly certified to perform sniff searches of vehicles.[5] **Resp. to Mot. to Suppress at 16.**

In addition to the requirement that dog sniff searches are done with reasonable suspicion, dog sniff searches must be done by a reliable dog. Typically, reliability is assessed by whether the dog is properly certified. *Florida v. Harris*, 568 U.S. 237, 246-47 (2013); *United States v. Parada*, 577 F.3d 1275, 1283 (10th Cir. 2009). Dogs tend to be considered reliable if the dog has an up-to-date certification and the Court's inquiry is typically limited to the legitimacy of the credentialing organization. *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011) (Gorsuch, J.) ("[T]he judicial task . . . is so limited: to assessing the reliability of the credentialing organization, not individual dogs.").

To the extent Sanchez makes arguments that the specific K-9, Tank, was unreliable, these arguments do not go to whether the certification organization is reputable which is the primary inquiry. **Doc. 71 at 10 (arguing Tank gave inconsistent alerts).** Therefore, these arguments are of little help to Sanchez. Courts have upheld dog sniffs even when dogs have spotty track records

---

[5] The Court has resolved the parties' arguments regarding whether reasonable suspicion existed above and will not reiterate those in this section.

and Sanchez does not even manage to make that showing here. *See Ludwig*, 641 F.3d at 1252 (finding dog sniff was reliable and established probable cause when the dog's alert data showed a 58% accuracy rating, citing cases from sister circuits upholding dogs with similar accuracy). While Sanchez argues that Tank gave inconsistent alerts, the Officer testified that Tank gives different types of alerts depending on the context. **Transcript at 62.** The Court finds the Officer's testimony credible. Relatedly, Sanchez notes that the Officer did not have the details of the certificate memorized for his testimony. ***Id.*** This is also of no consequence. The Court's inquiry pertains to the certification organization's legitimacy not to whether the Officer can recite offhand details of their training practices, certificate process, or the specific location of Tank's training records.[6] **Doc. 71 at 10–11.** Here, the Court finds that the K-9 Tank was certified by the International Police Canine Association, handled by Juan Rodriguez ("the Officer") of the New Mexico State Police, and that the certificate was valid at the time of the K-9 search.[7] **Resp. to Mot. to Suppress (Ex. 3).**

Last, Sanchez posits that the dog's training certificate is backdated. **Doc. 71 at 11.** Sanchez does not flesh out the consequences of backdating, why it relates to the K-9's reliability, or what conclusion the Court is meant to draw. The Court infers Sanchez could be suggesting that the Government or another party altered the certification document after the stop. First, Sanchez has not adequately demonstrated to the Court that the document is backdated. The Court has been unable to independently verify Sanchez's claim regarding hidden text boxes in Adobe Acrobat.

---

[6] Sanchez contends that the certificate was signed by an individual who may be facing separate, unrelated allegations. **Doc. 71 at 11.** Sanchez makes clear he is unable to confirm the allegations' veracity. ***Id.*** **("this information was not confirmed to be true").** Sanchez has insufficiently alleged this argument, conceding the information is unclear, and even, if not, the connection to whether the dog was reliable is dubious.

[7] The certificate states that it is "valid for one year." **Resp. to Mot. to Suppress (Ex. 3).** The certification was issued on November 8, 2024, and the K-9 search took place under a year later.

The text boxes do not appear in the document available on CM/ECF. Assuming these hidden text boxes do exist and were placed in the document by the certification organization, there are many other, simpler explanations such as the name change of the certifying association the Government points to. **Transcript at 79.** Importantly, the text boxes were alleged to be dated February of 2025, months prior to the traffic stop in question. **Transcript at 79.** Notably, the witness who posited this theory was not established as an expert in the necessary field and could not affirmatively claim that backdating occurred. **Transcript at 77–78.** Therefore, the Court concludes that the K-9 search was performed by a reliable dog as the dog possessed an up-to-date certification by a reputable credentialing organization and none of Sanchez's arguments to the contrary are persuasive.

## VII. The Officer's search of the entire vehicle was valid under the Fourth Amendment.

The dog's alert on the vehicle in addition to the suspicious answers given by the car's occupants gave the Officer probable cause to conduct the search. "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023) (citation modified). "A positive alert by a certified drug dog is generally enough, by itself, to give officers probable cause to search a vehicle." *Ludwig*, 641 F.3d at 1283. The Court holds that, since the dog alerted on the vehicle, the officers had probable cause to search the vehicle.[8] *Ludwig*, 641 F.3d at 1283.

## VIII. The detention of the passengers during the search was valid under the Fourth Amendment.

---

[8] Since the Court has determined that the vehicle search was done with probable cause, the Court does not need to address Sanchez's arguments that are based on the opposite assumption. On this note, Sanchez contends that, if the Court finds a violation of the Fourth Amendment in the vehicle search or in the detention of Sanchez, the evidence of fentanyl would have to be suppressed. **Mot. to Suppress at 8.**

Since the stop and K-9 search were done with reasonable suspicion, the detention of the car occupants during the stop and the car search were valid. Officers may remove individuals from a vehicle whenever reasonable even if they cannot establish a safety risk. *Brendlin v. California*, 551 U.S. 249, 258 (2007); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

On this issue, both parties reiterate their arguments contesting whether the continuation of the stop and the car search were valid. **Resp. to Mot. to Suppress at 17–18; Mot. to Suppress at 6.** Since the Court has determined that the stop, its extension, the K-9 search, and the vehicle search were valid, the detention of the occupants throughout was proper as well. In sum, the Court finds that no violation of the Fourth Amendment occurred and, thus, no evidence needs to be suppressed. *See United States v. Collins*, 534 Fed. App'x 743, 745 (10th Cir. 2013).

**CONCLUSION**

The Court finds that the traffic stop, K-9 search, and vehicle search did not violate the Fourth Amendment. As the Court finds no Fourth Amendment violation, there is no reason justifying suppression of any evidence.

**IT IS THEREFORE ORDERED** that Defendant Sanchez's Motion to Suppress Evidence **(Doc. 43)** is **DENIED**.

/S/
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE